OPINION
Appellant, Cathy Williams, appeals a decision of the Butler County Court of Common Pleas, Juvenile Division, terminating her parental rights and responsibilities and placing permanent custody of her son, Zachary Moore, with the Butler County Children Services Board ("BCCSB").
Zachary was born to Williams and Barry Moore on April 7, 1997. Shortly after Zachary's birth, BCCSB became involved with the family upon receiving a referral which alleged that Moore had an alcohol abuse problem and that both parties lacked adequate parenting skills. A BCCSB caseworker first contacted the family on April 21, 1997. During this initial visit, Moore became belligerent toward the caseworker and threatened to move the family out of state. Williams said little.
On May 1, 1997, BCCSB filed a complaint alleging that Zachary was a dependent child pursuant to R.C. 2151.04. The complaint alleged that Williams lacked adequate parenting skills and that both parents had a history of alcohol abuse. Zachary remained in the custody of his parents at this time, and a case plan was developed which required that Williams and Moore undergo psychiatric assessments. After an amended complaint was filed, the case plan was expanded to include individual therapy for both parents, couples counseling, participation in the Development of Living Skills ("DLS") program, and participation by Moore in anger management counseling and drug screening.
On March 17, 1998, BCCSB filed a second complaint alleging that Zachary was a dependent child. BCCSB also requested temporary custody of Zachary. The complaint alleged that Williams was incapable of caring for Zachary and noted that since the filing of the previous complaint, Moore had pled no contest to contributing to the delinquency of a minor and had been charged with domestic violence after striking Williams. At this time, the family was being evicted from their home, and Williams and Moore had failed to participate in counseling as required by the case plan.
BCCSB was granted temporary custody of Zachary after a shelter care hearing held on March 27, 1998. On May 26, 1998, the trial court found that Zachary was a dependent child after Williams agreed to the dependency finding and Moore failed to appear for the scheduled pretrial hearing.
BCCSB filed a motion for permanent custody of Zachary on June 29, 1998. At this time, BCCSB had been involved with the family for more than a year, and had seen little progress by Zachary's parents. Williams and Moore had been evicted from their home and neither had secured appropriate housing. Williams was living in a homeless shelter while Moore was renting a "sleeping room." Moore had been convicted of contributing to the delinquency of a minor, Williams' niece. He left Ohio for a period of six months and was incarcerated on his return. In spite of a no contact order arising from the domestic violence charge, Williams continued to see Moore. BCCSB expressed concern that Williams lacked the cognitive ability to master appropriate parenting skills.
The trial court held a hearing on the motion for permanent custody on March 18, 1999, and concluded the proceeding on May 26, 1999. Dr. Walters of the Children's Diagnostic Center completed an evaluation of Williams which was entered into evidence. Dr. Walters also testified at the hearing and stated that Williams' I.Q. was in the borderline range. As a result, Dr. Walters felt that Williams' ability to benefit from parenting and life skills classes was limited. Walters noted that this limited Williams' ability to budget money, to keep adequate food and diapers on hand, and to utilize the advice of pediatricians, counselors, and other professionals seeking to assist her.
At the hearing, BCCSB caseworker Christina Grandstaff testified that she observed ten to fifteen of Williams' visits with Zachary and that Williams' play with Zachary was often too rough. On several occasions, Grandstaff observed Williams playing a "game" in which Williams slapped Zachary on the cheek repeatedly, causing him to cry. After multiple discussions about this inappropriate behavior, Williams ceased the rough play. Grandstaff testified that although she had seen some improvement in Williams' parenting ability, Williams still lacked the necessary skills to adequately care for Zachary.
Karen Lavender, an educator with the DLS program, testified that she began working with the family in September 1997. She observed that, when Moore was not home, Williams would often leave Zachary propped up with a bottle, in spite of the fact that Lavender frequently emphasized the importance of nurturing Zachary, especially during feeding. On several occasions, Lavender found Williams heating the home with burners on the gas range and using a kerosene lantern, without a globe, to light the home, even after she was admonished not to do so. Lavender also observed that the home was very poorly kept on the occasions that Moore was not present.
Lavender found that Williams had great difficulty carrying over the skills she learned from week to week. Even after the family's eviction from their home, Williams failed to follow up on referrals that Lavender made to help her find housing. Lavender testified that she had not seen any progress in Williams' parenting skills until the month before the custody hearing when Williams began to develop a stronger bond with Zachary.
On June 23, 1999, the trial court entered a decision granting BCCSB permanent custody of Zachary. Williams appeals, raising four assignments of error.
Assignment of Error No. 1:
OHIO'S PERMANENT CUSTODY STATUTE, REVISED CODE SECTION 2151.414, VIOLATES CONSTITUTIONALLY PROTECTED EQUAL PROTECTION RIGHTS BECAUSE IT REQUIRES THE TERMINATION OF PARENTAL RIGHTS OF A PARENT WITH A MENTAL DISABILITY.
 Williams first argues that "R.C. 2151.414 is unconstitutional as a matter of law because it requires the termination of the parental rights of mentally retarded or developmentally disabled parents in violation of the parent's equal protection rights."
R.C. 2154.414 explicitly requires that the trial court find that a child cannot or should not be placed with a mentally retarded or mentally disabled parent whose disability is severe enough that it hinders the parent's ability to adequately care for the child.[1] However, contrary to Williams' contention, R.C.2151.414 does not mandate the termination of a parent's rights and responsibilities upon such a finding. Rather, R.C. 2151.414(E)(2) must be read in tandem with R.C. 2151.414(B)(1), which states that a court may grant permanent custody when it determines that the child cannot and should not be placed with either parent, and that it is in the child's best interest, as measured by the factors of R.C. 2151.414(D). If the court does not also find that it is in the child's best interest to terminate custody, the court can make alternative orders for the care of the child.
R.C. 2151.414(E) provides guidance as to making the cannot/ should not determination, but does not require a mandatory termination of parental rights. The cannot/should not determination is only half of the analysis required to terminate parental rights and responsibilities.
Viewing the statute in its entirety reveals that parents with mental disabilities are afforded the same protections as other parents not affected by a disability. In order to terminate any parent's rights and responsibilities, there must be a finding that it is in the child's best interest to do so, and that the child cannot or should not be placed with the parent. R.C.2151.414(B)(1). The statute represents a reasonable attempt to safeguard the rights of children and does not on its face violate the equal protection rights of mentally disabled parents. See Inre Mayle (June 3, 1991), Stark App. No. CA-8366, unreported; In reNorton (Nov. 26, 1990), Stark App. No. CA-8185, unreported.
Williams further argues that "[a]s a factual matter, the Magistrate erred to the prejudice of the mother, resulting in a violation of her constitutionally protected equal protection rights." Although referencing an equal protection violation, Williams fails to state with any specificity what violation occurred. Rather, she appears to argue that the trial court erred in its application of R.C. 2151.414.
When granting a motion for permanent custody, the trial court is required to make specific statutory findings. See In reWilliam S. (1996), 75 Ohio St.3d 95, syllabus. A reviewing court must determine whether the trial court followed the statutory factors in making its decision or abused its discretion by deviating from the statutory factors. Id.
When a state agency moves for permanent custody, the trial court is required first to determine "if it is in the best interest of the child to permanently terminate parental rights and grant permanent custody to the agency that filed the motion." R.C. 2151.414(A)(1). In making the best interest determination, the trial court must consider all relevant factors, including but not limited to the following factors enumerated in R.C.2151.414(D):
 (1) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster parents and out-of-home providers, and any other person who may significantly affect the child;
 (2) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
 (3) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999;
 (4) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;
 (5) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.
The trial court made specific findings relating to each of the above factors and concluded that it would be in Zachary's best interest to award permanent custody to BCCSB. The trial court noted that Zachary had been in foster care continuously since March 1998 and no other suitable relatives were available for placement. The trial court considered the fact that Williams was largely unable to care for her son and, due to her cognitive limitations, would not be a resource for permanent placement. The trial court also noted that a closer bond had developed between Williams and Zachary since he was placed in foster care.
Williams does not specifically challenge any of the trial court's findings regarding Zachary's best interest. We find that the record amply supports the trial court's findings and its ultimate determination that an award of permanent custody to BCCSB would be in Zachary's best interest.
In addition to determining the child's best interest, the trial court must determine by clear and convincing evidence whether the child can be placed with a parent within a reasonable time. R.C.2151.414(B)(1)(a). The trial court is required to enter a finding that the child cannot be placed with a parent within a reasonable time if any factors set forth in R.C. 2151.414(E) apply, including the following:
 (1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.
 (2) Chronic mental illness, chronic emotional illness, mental retardation, physical disability, or chemical dependency of the parent that is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year * * *.
* * *
(12) Any other factor the court considers relevant.
 The trial court in the present case specifically enumerated these sections of R.C. 2151.414 as applicable to appellant and set forth the facts which supported its findings.
The trial court found that Williams continuously and repeatedly failed to substantially remedy the conditions causing Zachary to be placed outside her home. Williams did not obtain adequate housing, but rather moved to a homeless shelter. She chose to continue her relationship with Moore in spite of a no contact order. Although Williams participated in outpatient therapy, she failed to follow through on a referral for a psychiatric evaluation. Despite months of therapy, Williams' therapist was unable to address key areas of concern, such as life skills, parenting skills, impulse control, and judgment issues. Although participating in a consistent course of therapy, Williams failed to make substantial progress in any of these areas due in large part to her cognitive limitations.
The record sufficiently supports each of the trial court's findings, and we find that the trial court's determination that Zachary should not and could not be placed with Williams within a reasonable time is supported by clear and convincing evidence. We find no abuse of discretion by the trial court in its application of R.C. 2151.414. Accordingly, the first assignment of error is overruled.
Assignment of Error No. 2:
OHIO REVISED CODE SECTIONS 2151 et. seq. [sic] AND 2151.414 VIOLATE CONSTITUTIONALLY PROTECTED DUE PROCESS RIGHTS OF A PARENT SUFFERING FROM MENTAL DISABILITIES.
 Williams first contends that, "as a matter of law, R.C. 2151 violates the due process rights of a parent suffering from cognitive limitations and mental illness because the statute fails to provide adequate protection for the incompetent parent."
While arguing that the statute "fails to provide adequate protection," Williams' complaint seems to be that the statute provides for an excess of protection. Williams argues that R.C. 2151 violates due process because it does not require a hearing to determine a party's competency before appointing a guardian adlitem.
R.C. 2151.281(C) states in pertinent part that "[i]n any proceeding concerning a * * * dependent child in which the parent appears to be mentally incompetent * * *, the court shall appoint a guardian ad litem to protect the interest of that parent." The statute thus requires that a guardian ad litem be appointed when a parent even appears incompetent, without first requiring a determination that the parent is indeed incompetent.
The appointment of a guardian ad litem does not introduce another adversary against the parent into the proceeding, but rather provides an additional level of protection for the incompetent parent. See, e.g., In re Baxter (1985), 17 Ohio St.3d 229,232. The statute allows the appointment to be made liberally, which does not infringe on a parent's due process rights but in fact works to ensure that the parent's rights are not compromised. Accordingly, we find this portion of the assignment of error to be without merit.
Williams further contends that "[a]s a factual matter, the trial court violated Appellant's due process rights by appointing her a Guardian-ad litem [sic] without first determining that she was incompetent by clear and convincing evidence." Williams contends that such a determination is required by Juv.R. 32(A).
Pursuant to R.C. 2151.281(C), a trial court is required to appoint a guardian ad litem to protect the interest of a parent who appears to be incompetent. The role of the guardian ad litem
"is to investigate the ward's situation and then to ask the court to do what the guardian feels is in the ward's best interest."Baxter at 232. The guardian ad litem is appointed to protect the ward's interest, and acts for her benefit. Id.
Although Juv.R.32(A) allows the court to order a mental examination to determine a party's competence, it creates no requirement that the court make a separate determination of competency before appointing a guardian ad litem. Rather, R.C.2151.281(C) mandates that the trial court appoint a guardian whenever a parent even "appears incompetent." Williams concedes as much in another argument when she states that Juv.R. 32(A)(4) provides "for the possibility of a competency examination." (Emphasis added.)
We further note that the trial court had the benefit of an evaluation conducted by Dr. Walters which indicated that Williams had borderline cognitive abilities. Williams at no time during the proceeding objected to the appointment of a guardian, and concedes in her brief that her guardian represented her adequately. Accordingly, we find no error in the appointment.
Williams also argues that the trial court improperly allowed Heather Felerski to serve as her guardian ad litem after the trial court allowed Felerski to withdraw as Williams' attorney. Felerski was initially appointed as Williams' attorney on July 7, 1997. Although the entry only appointed her to represent Williams as an attorney, both Felerski and the court were under the impression that she was also to serve as Williams' guardian adlitem. The confusion came to light when Felerski petitioned the trial court to withdraw as Williams' attorney due to difficulty communicating with her client. The trial court granted the motion to withdraw, and allowed Felerski to continue to serve as Williams' guardian.
Williams contends that the trial court should not have allowed Felerski to serve as her guardian ad litem in this circumstance. Juv.R. 4(C) expressly allows appointed counsel to also serve as guardian ad litem. However, when a conflict arises between counsel's role as attorney and role as guardian, the trial court should not hesitate to grant a motion to withdraw as guardian adlitem. Baxter, 17 Ohio St.3d at 229.
In the present case, the conflict arose in Felerski's role as Williams' attorney. Accordingly, the trial court properly granted Felerski's motion to withdraw as attorney. However, there was no conflict which required Felerski to also withdraw from her position as guardian ad litem. Felerski continued to advocate on Williams' behalf, and indeed took the same stance that Williams' later appointed counsel took, advocating to the trial court that the motion for permanent custody be denied. The guardian ad litem
was appointed to protect Williams' interests and, as conceded by Williams, adequately performed this duty. Finding no error in the appointment, we overrule Williams' second assignment of error.
Assignment of Error No. 3:
OHIO REVISED CODE SECTION 2151.414 VIOLATES STATUTORILY PROTECTED EQUAL PROTECTION RIGHTS OF A PARENT SUFFERING FROM A MENTAL DISABILITY.
 In her third assignment of error, Williams contends that "[a]s a matter of law, Ohio Revised Code section 2151.414 violates the Americans with Disabilities Act because it prohibits the trial court from considering alternatives that would comply with `reasonable accommodations' required by the ADA."
Title II of the Americans with Disabilities Act of 1990 ("ADA"), Section 12132, Title 42, U.S. Code, prohibits public entities from discriminating based on disability. The ADA was enacted to eliminate discrimination and create causes of action for qualified people who have faced discrimination. Section 12101(b), Title 42, U.S. Code. In pertinent part, the ADA states: "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." Section 12132, Title 42, U.S. Code.
The Ninth District Court of Appeals is the only Ohio court which has addressed the applicability of the ADA in a termination of custody case. See In re Ciero Rodriguez and Emilio Lopez (Aug. 4, 1999), Wayne App. No. 98CA007073, 1999 WL 568115, unreported. The Rodriguez court began by noting that the ADA, more than merely proscribing discrimination against individuals with disabilities, also articulates the means through which compliance with the ADA is to be obtained. Id. at *8. In adopting the ADA, Congress adopted the remedies and procedures that it had previously selected to enforce compliance with the Rehabilitation Act. Id.; Section 12133, Title 42, U.S. Code. These remedies and procedures were adopted from the enforcement provisions of the Civil Rights Act of 1964. Section 35.164, Appendix A, Title 28, C.F.R.
The procedure for enforcing the ADA begins with filing a complaint with a designated agency. Id. If appropriate, the agency will refer the case to the Department of Justice, which may file suit in a federal district court. Id. An alternative procedure is for a private individual to directly initiate an action in equity, with or without waiting for the federal administrative procedure to run its course. Id. All of the remedies and procedures provided by the ADA contemplate affirmative action on the part of the injured party.
The Rodriguez court concluded that neither Title II of the ADA, nor the related regulations, provide that the assertion of a violation of the ADA by a public entity may be used as a defense against a legal action by the public entity. Rodriguez at *8, citing Sections 12131-12134, 2000e-16, and 2000e-5(f)-(k), Title 42, U.S. Code; Section 794a, Title 29, U.S. Code; Sections 35.101-35.190, Title 28, C.F.R.; Section 35, Appendix A, Title 28, C.F.R. We agree with the conclusion of the Rodriguez court, and decline the invitation to create a new means of enforcement that was not adopted by Congress or included by the attorney general in the regulations adopted to implement the ADA. Williams' third assignment of error is overruled.
Assignment of Error No. 4:
THE TRIAL COURT ERRED TO THE PREJUDICE OF THE APPELLANT MOTHER IN GRANTING PERMANENT CUSTODY TO BCCSB IN THE ABSENCE OF REASONABLE EFFORTS TO IMPLEMENT ITS REUNIFICATION PLAN.
 In her last assignment of error, Williams contends that the trial court erred by granting the motion for permanent custody since no case plan was adopted by the trial court and BCCSB failed to make reasonable efforts to implement the case plan.
We first note that, contrary to Williams' assertion, a case plan was filed and adopted by the trial court as required by R.C.2151.412. A review of the record indicates that a case plan was initially filed on May 6, 1998. The trial court's June 29, 1998 decision adopts the case plan as the order of the court. Amended case plans were filed on September 22, 1998 and March 16, 1999. Although Williams states that no case plan was ever adopted, the case plan, as amended, was specifically adopted by the trial court in its June 23, 1999 decision.[2] Williams never requested a hearing regarding the case plan or otherwise contested the terms of the case plan.
Williams also contends that the trial court erred by finding that BCCSB made reasonable efforts to reunify her with Zachary. R.C. 2151.419(A) provides in part:
 At any hearing held pursuant to section * * * 2151.353
of the Revised Code at which the court removes a child from his home or continues the removal of a child from his home, the court shall determine whether the public children services agency or private child placing agency that filed the complaint in the case * * * has made reasonable efforts to prevent the removal of the child from his home * * *. The agency shall have the burden of proving that it has made those reasonable efforts. (Emphasis added.)
 Williams does not point to anything in particular that she feels BCCSB failed to do, but rather argues that its efforts as a whole were not reasonable. Despite her contention, our review of the record shows that BCCSB did make reasonable efforts to implement the reunification plan.
Williams was provided regular visitation with Zachary and participated in a number of case plan services, including the Daily Living Skills program, individual counseling, and an evaluation through the Children's Diagnostic Center. Williams was offered family counseling, but declined to participate. In spite of her participation in a number of services, Williams failed to attain the necessary skills to care for Zachary, failed to obtain appropriate housing, and continues her destructive relationship with Moore. We find that the BCCSB used reasonable efforts to reunite Moore with her child. However, Williams failed to make any substantial progress toward remedying the conditions which led to Zachary's removal. Accordingly, the fourth assignment of error is overruled and the decision of the trial court is affirmed.
YOUNG, P.J., and VALEN, J., concur.
[1] R.C. 2151.414(E) states in pertinent part:
 If the court determines, by clear and convincing evidence, at a hearing held pursuant to division (A) of this section * * * that one or more of the following exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent:
* * *
 (2) Chronic mental illness, chronic emotional illness, mental retardation, physical disability, or chemical dependency of the parent that is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year after the court holds the hearing pursuant to division A of this section * * *.
[2] The trial court's decision states as follows: "Based on the foregoing, it is the order of this court: * * * That the case plan, as prepared by the BCCSB, reflecting said permanent custody status, shall be adopted as an order of this court."